May it please the court, my name is Bob Dunn. I'm here representing the appellant, plaintiff BKWSpokane, the property owner in this case. I'd like to reserve five minutes of my time for rebuttal. All right. When the clock says five minutes, that will be your rebuttal time, but I'll also try to help you. Thank you, ma'am. This case arrives here by way of a summary judgment that was granted by the trial court, wherein material questions of fact existed, and which is a matter of fact and law, could not be resolved without being impermissibly weighed and decided by the trial court, and where evidence and inferences were not viewed in a light most favorable to the plaintiff in ruling on the defendant's motions. At the onset, this case is not about third party beneficiary claims, not about the third party beneficiary purchase and assumption agreement claim. It was not pled as a third party beneficiary claim. It was not argued as a third party beneficiary claim. We understand that the Ninth Circuit in GECCMC versus Morgan recognized that landlords or owners like BKW are only incidental beneficiaries to the PAA agreement, and not a third party beneficiary. Rather, this case is about the FDIC's breach of the express statutory duties and responsibilities that it had to a creditor under Statute Virea, and specifically 28 U.S.C. Section 1821 E. Prenn 2. And this court in Sharp stated that the statute, Virea, is directed at protecting both insureds, deposits, and the rights of creditors of financial institutions. And BKW, Spokane was a creditor, in fact, was the largest creditor of the failed bank, Bank of Spokane, or Bank of Whitman, rather, sorry. And BOW, when you see that, and we referred to it this morning, that's Bank of Whitman. BKW is an abbreviation for Bank of Whitman, Spokane LLC. Okay, Bank of Whitman is the bank that failed. Yes, ma'am. Yes. Virea is not a statute for the FDIC's preferential treatment of an assuming institution. It is for depositors and creditors. But, in fact, what happened here is exactly that. They gave preferential treatment to the assuming institution. The breach of the FDIC. Yes, ma'am. The FDIC's breach... However you characterize Virea, doesn't the statute give the FDIC this broad discretion on what's a reasonable time? Broad discretion, but not unfettered. And, in fact, if you take a look at the case law across the country, it looks like what the courts are saying is somewhere between 90 and 120 days. And if you take a look at the guidelines that FDIC has, in fact, they're encouraging from 91 days after they're appointed as the receiver, up to 120 days they have to make the decision. In this case, the decision wasn't made for 206 days. And what happened, and I gave you a calendar, and this really is fact-driven. And these cases with respect to what the statute says concerning a reasonable time frame, decisions within a reasonable time frame to repudiate a contract are fact-driven. So if you take a look at what happened here, the FDIC was appointed for this bank on August 5th, and they had a PAA agreement that they entered into with the bank, Columbia, the assuming institution. Under the PAA, they had 90 days in which to actually reject the underlying lease. And it's important to understand that the FDIC in W Spokane bought the building from the bank for almost $14 million. And the bank, as part of the agreement in taking the $14 million, said, we'll be the master lessee of the entire building, taking care of all the triple net expenses and that sort of thing. So Columbia comes in, and they have to decide whether they're going to accept that master lease. And they have 90 days in which to do it pursuant to the contract that they have with the government. And when that 90 days rolls around, and in this case, the deadline was going to be October 2nd, they have to decide, we're going to assume the master lease or we're going to reject it. And they have to give notice to the FDIC. The evidence in this case is Columbia knew from the onset, their testimony, that within a week, they knew that they weren't going to accept the master lease. So they waited. Well, we don't know why they waited, but we can assume why they waited, because after 90 days, if they don't assume the contract, they've got 90 days to get out of Dodge. They have to pack their bags and get off the premises under the PAA agreement. And it's mandatory. It's mandatory that they give notice within 90 days and mandatory that they vacate in 90 days if they don't assume. Well, if you're the bank, and you just rolled into town and you've taken over for a failed bank, if you give notice on the second day you're there or within the first week, your 90-day move date starts from that date. If you wait the entire 90 days, you've got six months, in effect, to move. And so it would behoove an assuming institution to wait the extra 90 days or go the entire 90 days and then have another 90 days to move out, but that's not what happened here. They didn't give notice within a week. They waited to the end. They gave notice on the last date, November 2nd, and then they notified FDIC, but nobody, nobody notified BKW. Now, there's some argument and testimony that maybe a person who was an associate of the owner knew something about this notion that Columbia never assumes, assumes these leases, but there was, the evidence is clear. There's no, there's no notice that was given to the owner, and the FDIC didn't give notice. And so the clock's running. The owner's sitting there saying, well, I didn't get notice that they've not assumed the lease. I'm assuming the lease is assumed, and I'll just, I'll just wait to see if they do. And so they waited to February 1st, and no one was moving. And so the owner wrote to the FDIC and said, we're assuming that, that in fact, you're the master lessee now, that Columbia's assumed the lease. No one gave us notice that, that it was repudiated. And so now we're out 180 days. No repudiation by the FDIC. Bank of Columbia's still on the premises, and they are now, they being FDIC and Columbia, based on the notice received from the owner, they're scrambling because they've missed the deadlines. And so the record from the FDIC that we presented to the court shows the FDIC's lawyers are now trying to create paperwork justifying why they're not terminating the occupancy of Columbia. And so we have some case memos that are being generated where they have to justify why they're doing what they're doing. And their justification, the sole justification that they presented to the underlying trial court was that there were some negotiations between Columbia and the owner for a sublease. And because the parties were negotiating in, quote, good faith for this sublease, that somehow was an extenuating factor for why the FDIC didn't have to repudiate the master lease. You don't dispute that, do you? That underlying factual basis? That they were negotiating? In good faith. No, no, they were negotiating, but what they were negotiating for, Your Honor, is for a partial lease. They were, they were, Columbia was trying to carve out what they otherwise would have assumed for the master lease. And so what happened was... Why else would, if it intended to assume a master lease, why would it have had these negotiations with you? Well, they wanted to stay there. They didn't want to move. And it would have behooved the owner to keep them there as a partial tenant if he had known that the lease had been repudiated, or that they were in fact going to move. That's what I'm not quite clear on. You're the owner, right? The owner. So what, what different, what different, what would you have done different if, if FDIC had done what you say they should have done? If the FDIC had repudiated within the 91 to 120 days, repudiated by February 1st, the owner then could have hired brokers across the state, across the region, saying, listen, we've got a brand new office building here that's, that's available for a master tenant. And, you know, sent the notice out that we've got a building that needs to be leased up. Or, if they knew that the or had repudiated the lease, they could have then engaged in different negotiations for a partial lease. But they were operating under the assumption when they were negotiating for the partial lease, we already have a master lease, so, you know, we're not too interested in anything you're trying to carve out. And so the, the issue becomes how they were, how they were penalized by not having all of the facts. And in this case, Columbia says, well, we didn't have to give notice to the owner when we decided not to assume. There's not another case in the country we were able to find where an assuming institution who did not assume a contract didn't give notice to both the FDIC and the owner. Why wouldn't you? Why wouldn't you give notice to the owner that, hey, we're not assuming the lease, unless you've got some ulterior motives to to come into play. And the ulterior motive here was, before they, before Columbia refused to assume the lease, they actually sent out a notice of intent to a building owner across the street and agreed to lease a building across the street. So the fallback was, position was, well, if we can't negotiate a partial lease that the owner doesn't know anything about in terms of your failure to assume, we've got a fallback position across the street. And what happened was, they played the game too, too close to the, to the, to their best. Just wanted to let you know you're down to about four and a half minutes. It's your choice. I'm gonna, I'm gonna, I'm gonna warn it up. They played it too close to their best and they ran out of time in order to move. And then they, they solicited the FDIC to give them an additional amount of time beyond the move-out date. And they didn't move out until June 30th. So the question is, how did they stay on after February 1st? Under what authority? The FDIC, under their PAA, didn't have authority to extend that mandatory move-out date. And there's nothing in FIREA that gives them the, the carte blanche authority to renegotiate the terms of that PAA without giving notice to the landlord. They, their argument is, they could have waited another six months if they wanted to, a full year, and still not have any recourse to the owner. Now sure, the owner was being paid rent, but he wanted a master lease and that's what he was paying. Good morning, and may it please the Court. Duncan Stevens on behalf of the Federal Deposit Insurance Corporation. Um, a couple points at the outset. First, as Your Honor said... Can I just ask you, are you splitting your time with Columbia Bank? I'm sorry. I, I, I apologize for not clarifying that. I will take 12 minutes and Columbia State Bank will take three. All right. Um, at the outset, as Your Honor said, there was, there was no reason for BKW to be negotiating with CSB over a proposed partial lease if CSB had assumed the master lease. So the premise, the premise that BKW was not told is, is, is erroneous. But frankly, Your Honor, to the question of whether the FTIC repudiated within a reasonable period, the notification to BKW of CSB's plans is inconsistent. The question before the Court on BKW's breach of contract claim is whether the FTIC repudiated this lease within a reasonable period. As Korten Franklin said, in, in making that analysis, the Court, the Court balances the, the interests of the receiver against the interests of the landlord. The interests of the receiver here were in ensuring an, an orderly transfer, a smooth transfer of banking operations from the failed bank to the assuming bank, from Bank of Whitman to Columbia State Bank, um, avoiding, avoiding unnecessary and burdensome obligations. And, and the landlord has an interest, obviously, in finding a substitute tenant as promptly as possible. In these circumstances, because of the pendency of the negotiations between BKW and CSB, the FTIC reasonably waited until those negotiations were done and then very promptly after that, just a few weeks, put out its, its formal repudiation notice. Now, look, let me... Sure. Um, the, the master lease was for the whole building. Yes. The, um, agreed, the deal with Columbia was for part of it. Yes. The, um, the, the landlord says, I didn't know that you were not negotiating about the whole building. And you say to that, it didn't, doesn't matter? I, I think the landlord is saying it thought CSB, um, had a, had a lease for the whole building. It was, had assumed the lease for the whole building. I don't think that's borne out by the record, though, because the landlord was told on many occasions that CSB had no interest in the lease on the whole building. Um, and the, the negotiations for a portion of it, you know, had, had been going on for some months. So I think the landlord did know. Well, let's assume for a minute that they, the landlord didn't know. Okay. That your position is what? That consistent with your obligations to the, uh, to, uh, with respect to the banking operations and the continuity, your obligations toward depositors and toward, um, the funds of the government that you, you, your, what you did was consistent in, in negotiating with the bank was consistent with those obligations regardless of whether or not the landlord knew. Yeah. Our position is that we wanted to make sure if CSB, the assuming institution was to move out, make sure that they had enough time to get all their property, get, get all their personal property off the premises. This is a particular concern because there was a data center on the property that, uh, that was old. It was a Bank of Whitman data center. It was old. It was fragile. Um, and CSB was concerned that it would need a lot of time to move. Um, so given that, the FDIC said, wait, we're not going to put an, an artificial effective date on this repudiation. Um, we're going to put an effective date on it. When we know, when these negotiations are all done, we know whether CSB is coming or going and we can, we can work with CSB on exactly how much time do you need. Um, we'll make the repudiation effective then. Um, so that's, that was our concern that we were concerned about the integrity of customer data and the continuity of operations. And it didn't make sense to choose an artificial effective date when it wasn't even clear whether CSB was going to stay on the property. One of the, uh, focus of Mr. Dunn's argument and in the briefs has been the timeliness or the reasonableness of the time lapse with repudiation. And he's given us a calendar that, you know, details the number of days, but he's also cited other temporal benchmarks that he thinks would in fact support that this is an unreasonable time lag. What is your response to that? My response, Your Honor, is that courts don't generally treat this as just a day-counting exercise. They look to the circumstances. So in the Cedar Men case, for example, it was a very long lapse. I believe it was 14 months between the initial appointment, um, and the ultimate repudiation. But the intervening circumstances, including the, the, the transition from the, uh, from the FDIC from conservator status to receiver status made that very long period reasonable. And the employees were What was the total period here? It was 206 days, so that's about seven months. Um, and in the employee's retirement, uh, employee's retirement system case, um, it was, uh, it was a similar length of time to what we had here, but there were the, it was intervening litigation over the, um, repudiating officer's authority, um, and there was a reappointment, and at that point there was a prompt repudiation. So the, the cases have, have different circumstances, but courts in each case look to the reasonableness of the, of the timeline in light of the circumstances. And here, almost all of the period, throughout all, almost all of the 206-day period, um, it was, it was either uncertain whether CSB was going to stay on the property or, well, it was uncertain whether CSB was going to stay on the property initially under the, the, the master lease and then later under a potential substitute lease. And the FDIC reasonably waited, admittedly it was, it was longer than usual, but the FDIC waited, um, reasonably waited the outcome of that and then just 24 days passed between the end of those negotiations and when the FDIC, um, issued its repudiation notice. The, the appellant seems to argue almost, not his words, but anything outside of 120 days is presumptively unreasonable. Yeah, and I don't think that's borne out by the case law, Your Honor. I think that cases, and we've, we've cited some in our brief, did, um, you know, including the Cedar Men and Employees Retirement System cases, um, don't, don't apply any kind of hard presumption and the, the guidance that he's citing, the FDIC guidance, is just that guidance and what he's pointing to is, quote, a proposed timeline. Um, it's certainly not a hard and fast requirement and the FDIC has never treated it as such. Um, and, and this case is a good illustration of why. You, the FDIC wanted the, wanted the assuming institution, the landlord, to have the flexibility to reach an agreement if they could reach one. Um, so having a, a hard and fast deadline that might have caused them to, might have cut off those negotiations prematurely, um, it wouldn't have been in anyone's, anyone's interest. Well, this was decided on summary judgment. Yes. Um, is this one of those not infrequent cases where a trial wouldn't make a bit of difference? I don't think so, Your Honor, because I think, I think the record was quite well developed on... There wouldn't be a jury trial here, would there? Um... Or, or, or is there a prayer for a jury trial? I, I think there was a jury demand. Okay. Um, but I think the record was, was quite well developed on the justification, the, the reasons why the FDIC waited as long as it did. Um, there were extensive depositions on, of the FDIC, of Columbia State Bank, of, of BQW. Um, so I, I don't think this is, this is a situation where, um, where having, having, having testimony would have shed a lot of light. Your, your argument is a, a Rule 50 motion after a full presentation of Exactly. Um, I take it there's no indication in this record that there was any other banking operation that could come in and take over that building? Or is there? Um, substitute tenants? Yeah. Um, no, and I think it's significant that there wasn't a substitute tenant until April 2013. This is a very tough market to fill. Uh, there were a lot of spaces. There weren't a lot of willing renters. Um, the length of the period that the property sat vacant suggests that as a result of the timing of the FDIC's repudiation. And it's a fairly small community. Yeah. So, um, I take it that, that the circumstances might well dictate a different result if, if similar actions had been taken in some, someplace like Chicago or San Francisco. Possibly. Yeah, where there, where there are more, um, where there's more potential for substitute tenants. Um, in that case there'd likely be some evidence in the record, and there isn't here, evidence in the record that, um, because of the timing of this repudiation, the, uh, the landlord lost an opportunity to, to rent out the property. But here there really isn't anything like that in the record. Um, I want to point, point as well, um, BKW's counsel said that it was mandatory for the FDIC to force out CSB after 180 days. It's not mandatory. Here is what the purchase and assumption agreement says. By failing to provide a notice of its intention to vacate, this is the assuming institution, such premises prior to, and I'm paraphrasing, 180 days, the assuming institution shall, at the receiver's option, be deemed to have assumed the lease. But the receiver, the FDIC, didn't exercise that option. And it didn't exercise it because of the circumstances here, because the parties were, were still on the property, were trying to, trying to negotiate a deal to stay on the property. So it's not true that it was mandatory, um, that, that CSB leave, uh, after 180 days. The FDIC could make that mandatory, but it didn't here. Um, and, and the record is clear that it, that the FDIC did, didn't do so because it wanted to give the parties that ability and wanted to make sure CSB had enough time to move its, uh, move its, its fixtures, its, its confidential bank files off the property. Um, I'm just, I'm looking at my notes for a moment to see if there's anything I'd like, anything else I'd like to pick up. Um, I don't believe there is, Your Honor. I'm happy to ask, ask any further questions. If not, I'll yield the rest of the time to CSB. Thank you. Thank you very much. You're one of the lucky advocates whose lawyer that went before didn't use up all your time. That gave you some extra. Uh, well, I, uh, good morning and thank you. I, I, I do feel lucky. Um, uh, Diana Myers on behalf of Columbia State Bank and, and briefly, um, for the Court. As between Columbia Bank, the assuming institution, and BKW, um, this case is materially indistinguishable from the Court's decision in 2012 in the GE Capital case that was referred to earlier. Um, it's the same underlying purchase agreement in every respect, all of the, the cited provisions that we, um, were relying on are the same. Uh, BKW is the lesser of the failed bank, as was GE Capital. Um, B, BKW seeks to enforce the terms of that lease against the, against Columbia, just as in the GE Capital case. And enforcing that lease against Columbia in this case would have the same effect. You'd have to read out provisions of the, of the purchase, uh, and enforce, um, to interpret. And the PAA is, is clear that it doesn't just cover, uh, cover contractual claims. It bars equitable claims under the PAA and with respect to it. So in this case here, where you are alleging that the conduct that Columbian engaged in, um, uh, occupying the building, paying rents, uh, paying taxes, making sure the property manager, um, managed and dealt with the, uh, subtenants, uh, are all authorized by or in fact required by the PAA. When you're, when you're, when your argument is based on the, uh, uh, Columbia's performance under that agreement, uh, you can't get around it because you don't have standing to write those provisions out of the agreement. So under GE Capital, the claims against Columbia were appropriately dismissed. The claims against Columbia were dismissed on 12B6 motion early in the GE Capital case. And, uh, affirming that ruling here is, is a simple matter of applying the court's, uh, decision in GE Capital and the decisions, uh, which are, which is consistent with the decisions of the, uh, appellate courts across the country. If there are no questions, then I will. Thank you. Thank you. Thank you. Mr. Dunn, you have some rebuttal time. Do I get her leftover time, Your Honor? My wish, yeah. I'm going to start. A good try. I'm going to start, um, backwards and then move forward. Columbia's in this case, not because of the PAA. Columbia's in this case because of what they did after February 1st when they were supposed to get out of the building. And the theory was implied contract. I spent two weeks earlier this year trying in, in federal district court in Northern Idaho, this very case, whether or not a third party can assume by conduct, um, a contract by its conduct and by its actions. And we cited the case of matter, um, matter of hat and truck and tractor at, uh, 69BR128. And that would be Washington law. If they've engaged in conduct after February 1st, leading the landowner to believe that in fact the contract has been assumed by their conduct, they keep paying the bills, they keep, um, occupying the space, they act as if they're a triple net lessee, then the question is, did they impliedly assume this contract? And that's, uh, federal common law, state common law. And, um, the, the, you know, the key case in the state of Washington that was a jury instruction in the, in the district court case that I tried was, um, the case of, uh, North Pacific Railroad versus Sunnyside, 540 Pacific, uh, 1387. The, the, uh, ruling was a third person may, of course, assume the obligation expressly in writing or may do so by implication where his conduct manifests an intent to become bound. So we have a period of time from February 1st all the way to June 30th with them acting as if they're rightfully in... Is this essentially an equitable claim? I'm sorry, ma'am. Is this essentially an equitable claim? The equitable claim, yes, that's right. And so you, you're, you were induced to believe that they were going to After February 1st, the FDIC still hadn't repudiated. They didn't repudiate until, in fact, we gave them a notice saying, okay, we've assumed the lease. And if you take a look at the conduct that was engaged in back in Texas where they're doing all this paperwork, the first, the first time that they identify anything at all about why they need to repudiate was on December 1st. That's in their paperwork. And on December 1st, there's not one word in their rationale and reason why they should repudiate about this lease negotiation that was going on. Not one word. And until, and until after February 1st, that's when the first rationalization comes in. Well, there's this lease that we've got to consider that Columbia was trying to engage in. And with respect to their arguments on that, there was never any question that the master lease was going to be repudiated. Never. Columbia knew it wasn't going to assume it. And so FDIC could have actually repudiated this lease in the second week of August, but they didn't. And so the bottom line is the statute requires a reasonable repudiation. And so if the facts presented to a jury was that Columbia knew within a week that they were going to not assume this lease, then the reasonable period of time for repudiation would have been on the 91st day whence they actually gave their formal notice. And that's a question of fact. And I think Your Honor acknowledged that this is a fact-driven case. And I don't believe that the trial judge could slam the gavel on the notion that there was a 206-day delay here and say that as a matter of law that was reasonable based on the facts that are before the court. In closing, what we're asking this court to do is to reverse the trial court. And I think that you can determine as a matter of law that based on the statute, the guidelines of the FDIC, and the existing case law, that 206 days on its face is not reasonable. We can't determine it's reasonable, you're saying, but we can determine it's unreasonable. Correct. All right, thank you. That's exactly right. All right, thank you for your argument. The case of BKW Spokane v. FDIC is submitted. Thank all counsel for coming this morning. Thank you.
judges: Schroeder, McKeown, Davis